**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **GEORGE W. JACKSON,** | ) | |
| **Plaintiff,** | ) | **Case No. 13 C 8304** |
| | ) | |
| **v.** | ) | **Judge Joan B. Gottschall** |
| | ) | |
| **CITY OF CHICAGO,** | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff George Jackson, a Foreman of Carpenters with the Chicago Department of

Transportation, contends that the City of Chicago did not promote him due to racial

discrimination and retaliation.[1]  The City's motion for summary judgment pursuant to Fed. R.

Civ. P. 56 is before the court.  For the following reasons, the motion is granted in its entirety.

## I. BACKGROUND

### A.    Local Rule 56.1

Jackson's Local Rule 56.1 submission suffers from numerous infirmities.  His response

to the City's facts does not contain "a concise summary of the paragraph to which it is directed,"

forcing the court to flip between the City's facts and Jackson's response.  *See* Loc. R.

56.1(b)(3)(A).

Moreover, Local Rule 56(b)(3) requires a party opposing a summary judgment motion to

both respond to the movant's facts and file a separate statement of additional facts.  However,

Jackson combined his response to the City's facts with his statement of additional facts.

Specifically, Jackson's responses consist of evidence that he believes refutes the City's facts and

---

[1] Jackson's amended complaint also includes an age discrimination claim, but Jackson
withdrew this claim in his response to the City's motion for summary judgment.

additional evidence that he believes is related or supports his position, as opposed to a response followed by a separate section containing additional facts. This is impermissible and could serve as the basis for striking Jackson's response in its entirety. *See Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 643-44 (7th Cir. 2008) (district court properly did not consider portions of the plaintiff's response to the defendant's facts as the response "contained several extremely long, argumentative paragraphs, and in those paragraphs [the plaintiff] simultaneously denied the veracity of [the defendant's] proposed material facts and presented additional facts of his own"); *Cardoso v. Cellco P'ship*, No. 13 C 2696, 2014 WL 6705282, at *2 (N.D. Ill. Nov. 26, 2014) (declining to consider additional facts in a response to the defendant's facts because "proper responses to the movant's proposed facts point to evidence refuting the movant's facts"; "[i]t is improper to add additional unrelated facts"); *Howard v. Value City Furniture*, No. 12 C 02923, 2014 WL 1227559, at *1 (N.D. Ill. Mar. 25, 2014) (striking the plaintiff's combined response to the defendants' facts and the plaintiff's additional facts because the plaintiff's filing created an unnecessarily confusing record).

"Compliance with local rules like Rule 56.1 ensures the facts material to the issues in the case and the evidence supporting such facts are clearly organized and presented for the court's summary judgment determination." *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 219 (7th Cir. 2015). This clearly did not happen here. Nevertheless, in an exercise of its discretion and in the interests of resolving the City's motion on the merits, the court declines to strike Jackson's hybrid submission. Jackson's counsel is cautioned that further combined submissions like the one filed in this case may be stricken as "[i]t is not too much to expect counsel to comply with straightforward procedures, clearly outlined in the rules." *Howard*, 2014 WL 1227559, at *1.

On a related note, the City filed a reply in support of its facts and in response to Jackson's combined Rule 56.1 submission. This is normally improper. *See*, *e.g.*, *Killis v. Cabela's Retail II, Inc.*, No. 13 C 6532, 2015 WL 128098, at *1 (N.D. Ill. Jan. 8, 2015). The court will nevertheless consider the City's reply as the City had no choice but to file it given Jackson's non-conforming hybrid submission.

Next, the parties cite to deposition transcript excerpts provided by the opposing party but periodically neglect to ensure that the excerpts include the cited pages.[2] For example, the City cites to an excerpt submitted by Jackson that does not contain the pages specified by the City. (Dkt. 83 at ¶ 13.) The court cannot consider a statement of fact that is supported by documents that are not before it. *See*, *e.g.*, *Ballard v. Zimmer, Inc.*, No. 11 C 6786, 2015 WL 5144350, at *12 (N.D. Ill. Aug. 31, 2015).

Turning to the substance of the Rule 56.1 submissions, many of Jackson's responses to the City's facts that are marked as disputed cite to non-responsive evidence. For example, Jackson "dispute[s] in part" that, during the relevant time period, he was a "Foreman of Carpenters" with the Chicago Department of Transportation ("CDOT") by asserting that the City placed him in this position because he filed a discrimination lawsuit. Characterizing a fact as disputed does not make it so. *Cardoso*, 2014 WL 6705282, at *1. Where Jackson relies on non-responsive facts, the City's facts are deemed admitted to the extent that they are supported by the

_____

[2] In this regard, the court notes its disapproval of the practice of omitting the first page of deposition transcript excerpts as it makes the record unnecessarily difficult to work with. The City provided this helpful information (as do counsel in virtually all cases before the court); Jackson's counsel largely did not.

record.  *See Roberts v. Advocate Health Care*, 119 F. Supp. 3d 852, —, No. 14 C 442, 2015 WL 4719897, at *1 (N.D. Ill. Aug. 7, 2015).

The City frequently asserts that Jackson's Rule 56.1 submissions mischaracterize the record.  The court has evaluated the cited underlying evidence and has not relied on Jackson's summation of that evidence.  *See United States Soccer Fed'n, Inc. v. United States Nat'l Soccer Team Players Ass'n*, No. 14 C 9899, 2015 WL 5730267, at *1 (N.D. Ill. Sept. 29, 2015).  Although it notes some specific examples below, as a general rule, the court has also excluded legal conclusions and arguments.  *Id*.  With this in mind, the court turns to the facts.

## B.     Facts

Plaintiff George Jackson is an African American male who was born on November 4, 1950.  He is a member of the United Brotherhood of Carpenters and Joiners of America (the "Union") and has worked for the City since 1987.  During the time period relevant to this case, he held the position of "Foreman of Carpenters."

### 1.     The Application Process for the Position of General Foreman General Trades

Individuals in the position of a General Foreman of General Trades ("GFGT") are responsible for managing construction activities for capital improvement projects involving the modification, renovation, or rehabilitation of City facilities.  The City required GFGT applicants to take a test.  Part I was a multiple choice test on ethics, requirements imposed by the *Shakman* case about political patronage, and personnel rules.  Part II was a multiple choice test designed to assess technical and supervisory skills.  Part III was an optional structured oral interview comprised of questions designed to assess supervisory skills and technical knowledge.  According to Stefanie Pugliese, an employee in the City's testing department, the three-part test

-4-

used for GFGT openings was the byproduct of negotiations based on the federal consent decree in the *Shakman* case addressing the City's hiring practices.

## 2. Jackson's Application for the GFGT Openings With the Department of Fleet and Facility Management

On April 26, 2013, the City posted a bid/job announcement for two GFGT positions with the Department of Fleet and Facility Management. The Department of Fleet and Facility Management elected to use the optional Step 3 oral interview when evaluating GFGT candidates so candidates had to complete all three parts of the GFGT test.

Jackson and nine other people applied for the two Department of Fleet and Facility Management GFGT positions. Four of the applicants were not eligible to bid, leaving six applicants. Jackson took the two written portions of the test on June 4, 2013. All six of the eligible applicants, including Jackson, passed the written test and progressed to the interview stage of the testing process.

Project Manager Edwin Batchman and Deputy Commissioner Derek Messier conducted the interviews for the GFGT positions. Batchman, who reported to Messier, was responsible for supervising the two new GFGTs. Neither Batchman nor Messier knew Jackson personally or professionally. They interviewed Jackson on June 27, 2013.

With respect to the questions asked during his interview, Jackson asserts that City testing manager Halina Ferdymus "recognized there was a problem with some of the questions in the oral interview test" (specifically, the record shows that she stated that one question "should focus on one or two pro blem [sic] areas at most" and that a second question was "poorly worded bu t [sic] otherwise OK"). (Pl.'s Ex. 17.) The cited evidence shows that Ferdynus's concerns were

addressed and that Ferdymus approved the final version of the questions before Jackson's interview.

Batchman was the primary interviewer. He asked each applicant the same five questions:

Question 1: One of your tradespeople is underperforming in several areas, such as unscheduled swipe out locations or the inability to meet the scheduled completion of work orders. As the immediate supervisor, how would you address the situation?

Question 2: You are tasked with a major renovation project that requires the use of carpenters, electricians, plumbers, painters, and construction laborers. After reviewing the construction drawings, you are asked to initiate the project. What actions would you undertake before proceeding and while the renovation was underway?

Question 3: While a renovation project at a building is underway, a deputy commissioner from the Dept. of Public Health (the department who [sic] operates the building) directs that you add scope to the project. As the General Foreman of General Trades in 2FM [the Department of Fleet and Facility Management], how do you respond?

Question 4: As the General Foreman of General Trades, your work group currently has 30 open work orders that are due by the end of this week and 2 projects scheduled to be completed. It is Tuesday morning and you recognize that you will not be able to accomplish all that is scheduled by the weeks [sic] end with the resources you have. What would you do?

Question 5: As a Supervisor, what should you do when an employee reporting to one of your foreman [sic] is injured?

(Def. Ex. E, Batchman Dep., Ex. 1.)

Using "behaviorally anchored" rating scales (Pl. Ex. 2, Pugliese Dep., at 36-37), Batchman gave Jackson a score of 44 out of 100, and Messier gave Jackson a score of 28 out of 100. Batchman and Messier did not speak with anyone at the Chicago Department of Transportation as part of their evaluation of Jackson. Batchman and Messier both stated that

"[t]hey were not aware that [Jackson] had ever previously complained about discrimination and they did not retaliate against [Jackson]."[3]  (Def. Am. Facts, Dkt. 70, at ¶ 24.)  Batchman and Messier also asserted that they did not discriminate against any of the candidates based on race, had no predetermined ideas about who should be selected, had not received instructions about who to select, and had no reason to believe anyone discriminated against Jackson during the application process.[4]  They believe that they did their best to evaluate the candidates objectively. They did not consult with each other regarding their interview evaluations; they evaluated each candidate independently.

According to Jaqueline Toledo (the recruiter with the City's Department of Human Resources assigned to the two Department of Fleet and Facilities Services GFGT openings), a score of 60% is required to pass the interview portion of the test.  Jackson received a score of

---

[3]  In response to the City's corresponding statement of fact, Jackson states "[u]ndisputed as to fact.  Disputed as to inference."  Jackson does not provide a citation to the record and the City's fact is supported by the cited portions of the record.  A "dispute as to inference," besides being cryptic, has no place in a response to a Rule 56.1 fact statement.  *See, e.g.*, *Bonner v. O'Toole*, No. 12 CV 981, 2015 WL 1586661, at *1 (N.D. Ill. Apr. 3, 2015) (argumentative responses, such as a contention that a given factual statement suggests an "[i]mproper legal inference" are inappropriate).  The City's contention that Batchman and Messier "were not aware that [Jackson] had ever previously complained about discrimination" is deemed admitted. *See* Loc. R. 56.1(b)(3).  The court, however, will not deem it admitted that Batchman and Messier did not retaliate against Jackson, as this is a legal conclusion, not a fact.  *See United States Soccer Fed'n, Inc.*, 2015 WL 5730267, at *1.

[4]  Jackson attempts to dispute this fact by noting that Stefanie Pugliese (an employee in the City's testing department) was aware that City testing manager Halina Ferdymus had criticized some of the interview questions.  (Dkt. 78 at ¶ 25.)  This is irrelevant because, as discussed above, the questions were edited to address Ferdymus' concerns prior to Jackson's interview, and Jackson was asked the edited version of the questions.  Jackson also repeats that Batchman used behaviorally anchored rating scales to assess each candidate; he appears to be arguing that these scales are discriminatory so Batchman and Messier necessarily discriminated against him.  Once again, legal arguments are improper in Rule 56.1 submissions.  *See United States Soccer Fed'n, Inc.*, 2015 WL 5730267, at *1.

36% (an average of the scores given by Batchman and Messier).  Based on Jackson's interview

score, the City took the position that Jackson (as well as two other candidates) "failed the

interview."  (Dkt. 70 at ¶ 13.)[5]  During his deposition, Jackson testified that he neither

recognized any of the five questions he was asked during his interview nor recalled the answers

he gave during his interview.  When asked at his deposition how he would answer each of the

five questions, he responded "I don't know."[6]  (Def. Am. Facts Ex. D, Jackson Dep., at 343-48

and Ex. 52 thereto.)

### 3. The Selection of the Two GFGTs

The remaining three candidates — Walter Kapelinski, Elgin Swanigan, and Anthony

Greco — "passed" the interview.  Kapelinski and Greco are not African-American; Swanigan is

African-American.

- Kapelinski scored 90% on Part 1 of the testing process, 85% on Part 2, and 84% on Part 3 for an average of 88%;

---

[5]  Jackson denies that he "failed the interview," pointing to the evidence summarized above that he says shows that the interview portion of the testing process was improperly suggestive.  He also contends that Batchman did not record his responses to all of the interview questions.  The City asserts that Batchman testified that he was not required to take notes or to take complete notes, but supports this representation with a cite to portions of Batchman's deposition that are not in the record.  Jackson has not pointed to any evidence calling the City's reliance on a passing interview score of 60% into question.  The court will, however, proceed based on the assumption that Jackson contends that the oral interview scoring was racially biased.

[6]  Jackson's counsel asserts that the "I don't know" answers are understandable because the interview questions about what Jackson would have answered called for impermissible speculation.  Based on its review of the transcripts, the court disagrees.  As discussed below, this was Jackson's moment to elucidate what he said during the interview.  Given his alleged inability to recall his answers and his refusal to detail what he would have said when asked the five standard questions, the record does not contain the best possible evidence (barring an audio recording) that could have supported a claim that Jackson was sufficiently knowledgeable and articulate, yet received unfairly low scores.

- Swanigan scored 85% on Part 1, 80% on Part 2, and 76% on Part 3 for an average of 80%;

- Greco scored 95% on Part 1, 80% on Part 2, and 82% on Part 3 for an average of 82%; and

- Jackson scored 90% on Part 1, 85% on Part 2, and 36% on Part 3. The City did not average his scores because it did so only for candidates adjudged to have "passed" the interview part of the test. Mathematically, Jackson's scores average 70.33%.

(Pl. Ex. 8.)

Jackson contends that because his three scores average 70%, he should have "passed." Despite Jackson's incorrect citation to the record (a ground for excluding the cited document), the court eventually was able to locate the position announcement that Jackson says specifies that 70% is a passing score – it is attached as Exhibit 1 to Jacqueline Toledo's affidavit (Def. Am. Facts Ex. B, Ex. 1 thereto.) Contrary to Jackson's characterization, the position announcement states that 70% is a passing score for Parts I and II and that "[c]andidates who pass all sections of the testing process will be hired by total average score and then seniority/lottery order." (*Id*. at DEF000796.) The applicable collective bargaining agreement between the City and the Union provides that "[w]here bargaining unit applicants are relatively equally qualified, the Employer shall select the most senior employee of those applying. The Employer shall determine whether employees are 'relatively equally qualified.' 'Seniority' shall mean, for purposes of this Section, the employee's service in the job title (time-in-title) Citywide." (Def. Am. Facts Ex. B, Todelo Aff, ¶ 9.)[7]

---

[7] The City cited to Toledo's affidavit as "Def. Ex. 4" or simply referred to her affidavit without the benefit of any citation. The inaccurate and missing citations are grounds to exclude the affidavit. *Cardoso*, 2014 WL 6705282, at *3. However, as the court has overlooked numerous problems with Jackson's submissions, the court will similarly overlook this problem.

The parties agree that Jackson had more seniority than Greco or Swanigan and less than Kapelinski. Jacqueline Toledo, an Assistant Commissioner with the City's Department of Human Resources who was involved with the selection process, believed that Kapelinski, Swanigan, and Greco were "relatively equally qualified," but Swanigan had the least seniority. (Def. Ex. B, Toledo Aff., at ¶ 9 and Ex. 2, 4, and 5 thereto.)

David Reynolds, the Commissioner of the Department of Fleet and Facility Management, and Deputy Commissioner Kurt Peterson were the decisionmakers. Peterson recommended that Reynolds hire Kapelinski and Greco. Reynolds accepted Peterson's recommendation.[8] Reynolds did not consult with anyone at the Chicago Department of Transportation regarding the decision. Reynolds denies that he discriminated or retaliated against Jackson when making his selection. Reynolds did not know Jackson and was unaware that Jackson was African-American. In 2013, Kapelinski retired and Swanigan, who is African-American, was promoted to the open GFGT position.

### 4.    Jackson's Criticism of the GFGT Selection Process

The City contends that it was required to test applicants for GFGT positions using objective criteria and that it did so. Jackson contends that the interview portion of the test was improperly subjective. However, the evidence he cites does not support this proposition:

- First, Jackson cites to testing department employee Pugliese's deposition, who testified that interviewers score applicants using "guidelines as to how to evaluate the candidate's answer to the particular question." (Pl. Ex. 2, Pugliese Dep., at

---

[8]  The City asserts that Reynolds did not discriminate against any of the candidates based on race or retaliate against any of the candidates. Jackson does not dispute this contention as he states, "Undisputed. Disputed as to inference to be drawn from the fact." (Dkt. 78, ¶ 28.) However, the so-called "fact" is a legal conclusion. As such, the court will disregard it. *See United States Soccer Fed'n, Inc.*, 2015 WL 5730267, at *1.

37.)[9]  The scoring is "at the discretion of the tester" but "us[es] this behavioral anchoring scale."  (*Id.*)  The record thus shows that testers are instructed to score candidates based on a specific set of criteria.  There is an element of subjectivity, in the sense that the testers are not automatons and might misapply or misunderstand the criteria.  However, it is mischaracterizing the record to suggest, as Jackson does, that testers lacked any boundaries when scoring interviews.

• Second, Jackson states that he applied for the position of GFGT "several times in the past" and "was rated subjectively and negatively."  (Dkt. 78, at ¶ 10(b).)  This is allegedly supported by Jackson's affidavit (Pl. Ex. 3, Jackson Aff., ¶¶ 3-4), which states that Jackson applied "many times" in the past for the position of GFGT and is "very much familiar with the job responsibilities" of a GFGT even though he has never been selected to work as a GFGT.  The court accepts that Jackson personally believes that the interview process is improperly subjective.  As discussed below, however, a plaintiff's personal belief about his qualifications is insufficient to establish discrimination.  *See, e.g.*, *Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 323 (7th Cir. 2003).

• Third, Jackson asserts that City testing manager Halina Ferdymus "recognized there was a problem with some of the questions in the oral interview test" (in fact, she stated that question to "should focus on one or two pro blem [sic] areas at most" and question 5 was "poorly worded bu t [sic] otherwise OK").  (Pl.'s Ex. 17.)  As discussed above, Ferdynus's concerns were addressed and Ferdymus approved the final version of the questions on May 2013, before Jackson's interview in June 2013.  Criticisms of outdated questions are irrelevant.

• Fourth, Jackson asserts that Pugliese stated that bias in a test can be determined only after the fact.  Jackson appears to be arguing that this means that Pugliese believed that the GFGT oral questions were biased.  This inference is not supported by the record, as Pugliese testified that she generally attempts to draft neutral test questions using available data, but there is no way to determine definitively if a question is biased until it is "piloted" against an actual population of test takers.  (Pl. Ex. 4, Pugliese Dep, at 21.)

• Fifth, Jackson asserts that the GFGT test "had to have *Shakman* oversight and a *Shakman* monitor present to observe the integrity of the process due to past hiring issues."  (Dkt. 78, at ¶ 10(e).)  Jackson appears to be arguing that this shows that the oral part of the test was flawed.  The cited evidence, however, shows merely that a federal monitor was present during the oral portions of the 2013 GFGT test

_____

[9]  Sme of the cited deposition transcripts (such as Pugliese's) are marked "confidential" but the parties filed all of their summary judgment submissions on the public docket.  Thus, the court assumes that the parties intended for all of their evidence to be public.

due to *Shakman* concerns. Concerns about political patronage have no discernable connection to whether answers to the five GFGT interview questions were improperly scored.

• Sixth, Jackson asserts that Batchman, one of the two people who conducted Jackson's oral interview, stated he could not recall if a *Shakman* monitor was present during Jackson's interview. This is undisputed but irrelevant.

In addition, Jackson stresses that successful applicant Anthony Greco testified at his deposition that he thought that the interview part of the test was subjective. Greco, however, explained that his view about so-called subjectivity was based on his belief that candidates needed to rely on their "skill" and "general industry knowledge" when answering interview questions (*i.e.*, that answers were unique to each candidate). (Pl. Ex. 7, Greco Dep., at 75.) Greco also testified that "there definitely had to be right answers" to the questions asked during interviews. (*Id.*)

Jackson also disputes that Kapelinski, Swanigan, and Greco were all "relatively equally qualified" because he believes that the oral interview part of the selection process was flawed due to racial bias and a desire to retaliate against him for prior complaints of discrimination. Next, Jackson believes that the City placed him at an unfair disadvantage because he was never able to "act up" (*i.e.*, work as a substitute and gain experience) as a GFGT. In addition, as noted above, he contends that his scores for all three parts of the test should have been averaged. This would make him the lowest-scoring of the candidates who were interviewed but presumably, he believes that his seniority would have bumped him past a higher-scoring candidate.

In support of his claim of discrimination, Jackson points to the fact that the two successful candidates (Kapelinski and Greco) are not African-American. In addition, at his deposition, he testified that when he started with the City over 27 years ago, an unknown person

told him, "[T]hese guys in these departments are connected to each other, so they call each other and ask questions about certain people, and they will do that." (Def. Am. Facts Ex. D, Jackson Dep, at 359.) He also voiced his opinion that most applicants for City jobs were white and that they were promoted even though they had less experience and education than he did. (*Id.* at 357.)

Bruno Chuich, a Caucasian carpenter with the Chicago Department of Transportation, worked with Jackson. Chuich testified at his deposition that numerous unnamed foremen and carpenters ("basically, everyone there") did not want to work with Jackson. (Pl. Ex. 9, Chuich Dep., at 257-58.) Chuich heard others question Jackson's capabilities but never heard anyone refer to Jackson's race. Despite criticisms voiced by others about Jackson's capabilities, Chuich opined that Jackson's unpopularity had to be racially motivated because it was "the only thing [he] could think of. That's the only thing different." (*Id.* at 258.)

Although Jackson relies on Chuich's opinion that a Chicago Department of Transportation GFGT who supervised Jackson discriminated against Jackson based on his race, Jackson agrees that the Chicago Department of Transportation played no role in his application for a GFGT position with the Department of Fleet and Facility Management. As he explained, his "lawsuit is dealing with general services or fleet management, nothing to do with what's going on with [the Chicago Department of Transportation]." (Def. Am. Facts. Ex. D, Jackson Dep., at 100.)

Wayman Payne is a carpenter formerly with the Chicago Department of Transportation who is now with the City's General Services, which has been merged with the Department of Fleet and Facility Management. Payne testified at his deposition that "everyone at the City"

complains about the interview portion of the GFGT test because "those people" (presumably, the interviewers) are "stacked against" minorities. (Pl. Ex. 11, Payne Dep., at 216-17.) Payne believed that Jackson was qualified for a GFGT position based on his experiences working with Jackson on "a few jobs" that were "big." (Def. Reply Ex. E, Payne Dep., at 23.) Payne opined that the Chicago Department of Transportation excluded Jackson from promotion opportunities due to Jackson's race because Payne "witnessed how management treated [Jackson] differently than other employees in [the Chicago Department of Transportation] who were also carpenters or foremen" and "[t]here is no other reasonable explanation." (Pl. Ex. 12, Payne Aff., ¶¶ 8-11.) Payne had no role in Jackson's attempt to be promoted to a GFGT with the Department of Fleet and Facility Management.

## II.  LEGAL STANDARD

Summary judgment is appropriate when the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Smith v. Hope Sch.*, 560 F.3d 694, 699 (7th Cir. 2009). "[A] factual dispute is 'genuine' only if a reasonable jury could find for either party." *SMS Demag Aktiengesellschaft v. Material Scis. Corp.*, 565 F.3d 365, 368 (7th Cir. 2009). The court ruling on the motion construes all facts and makes all reasonable inferences in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is warranted when the nonmoving party cannot establish an essential element of its case on which it will bear the burden of proof at trial. *Kidwell v. Eisenhauer*, 679 F.3d 957, 964 (7th Cir. 2012). The court must apply the summary judgment standard with added vigor in employment discrimination

cases where motive and intent are especially crucial.  *Wright v. Illinois Dep't. of Corr.*, 204 F.3d

727, 730 (7th Cir. 2000).

## III. DISCUSSION

### A.    Racial Discrimination

In his opposition to the City's motion for summary judgment, Jackson states that he "will

show discrimination using circumstantial evidence from which a reasonable inference of

discrimination may be inferred" – *i.e.*, that he will proceed on his claim that the City did not

promote him due to racial discrimination using the direct method of proof.  (Pl.'s Resp., Dkt. 79,

at 4.)  Jackson also refers to the *McDonnell Douglas* burden shifting method, commonly known

as the indirect method, and asserts that the City treated similarly situated individuals outside the

protected class more favorably.

The Seventh Circuit has raised "serious questions" about the use of the direct and indirect

methods but "litigants and courts still properly discuss racial discrimination claims . . . using the

language of either the direct or indirect method[s] of  proof."  *Smith v. Chicago Transit Auth.*,

806 F.3d 900, 905-06 (7th Cir. 2015) (quoting *Simpson v. Beaver Dam Cmty. Hosps., Inc.*, 780

F.3d 784, 789-90 (7th Cir. 2015)).  Under both methods, "the continued focus [is] on whether the

plaintiff has introduced sufficient evidence to give rise to an inference of *intentional*

discrimination."  *Smith*, 806 F.3d at 906 (quoting *Young v. United Parcel Serv., Inc.*, 135 S.Ct.

1338, 1353 (2015) (emphasis in original)).

Jackson states that the "only issue in establishing the prima facie case is whether

similarly situated persons [presumably the two successful non-African-American applicants]

were treated more favorably [due to race]."  (Pl.'s Resp., Dkt. 79, at 4-5.)  In support, he argues

that the interview segment of the three-step process for selecting GFGTs is improperly

subjective, so the "logical inference" is that the City prevented him from receiving a promotion

by giving him artificially low scores based on his race.  (*Id*. at 5-6.)  The court turns to whether

these arguments are sufficient to survive summary judgment based on the direct and indirect

methods of proof.

### 1.    The Direct Method

Under the direct method of proof, a plaintiff may point to direct or circumstantial

evidence suggesting that the City's "decision to take the adverse job action was motivated by an

impermissible purpose."  *See Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 938-939 (7th Cir.

2003); *Malin v. Hospira, Inc.*, 762 F.3d 552, 559 (7th Cir. 2014) ("Despite the name of the direct

method of proof," a plaintiff may rely on circumstantial evidence to support a claim under the

direct method of proof).  The Seventh Circuit has used the metaphor of a mosaic to illustrate the

kind of circumstantial evidence that can support an inference that a plaintiff was the victim of

discrimination.  *See Muhammad v. Caterpillar, Inc.*, 767 F.3d 694, 699 (7th Cir. 2014) ("We

have used the metaphor of a 'convincing mosaic of circumstantial evidence,' evincing the image

of a mosaic whose individual tiles add up to a complete picture, but that is just one means of

conceptualizing the requirement that the circumstantial evidence must be sufficient to support

the necessary inference.").

"A convincing mosaic must include evidence from which an inference of retaliatory

intent could be drawn."  *Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635, 643-44 (7th Cir. 2013).  This

evidence can "include: (1) suspicious timing; (2) ambiguous statements or behavior towards

other employees in the protected group; (3) evidence, statistical or otherwise, that similarly

situated employees outside of the protected group systematically receive better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action." *Id*. at 644-45. Because the concept of a "convincing mosaic" is a "rhetorical tool[]," these elements are "not exclusive, nor are they a set of prongs of a circumstantial evidence 'test.'" *Id*. at 644. Instead, the "ultimate question" is whether, when drawing all reasonable inferences in the plaintiff's favor, a reasonable jury could find it is "more likely than not that the plaintiff was subjected to the adverse employment action" because of membership in a protected class or participation in protected activity. *See id.*

A failure to promote claim based on improper subjectivity in interviews is not actionable unless the alleged subjectivity is linked to a protected characteristic, such as race. *See Murray v. Golden Rule Ins. Co./United Health Corp.*, 23 F. Supp. 3d 938, 952 (S.D. Ind. 2014). Thus, as a general rule, "there is nothing improper with an employer basing promotion decisions on subjective factors such as interview performance." *Id*. (citing *Armstrong v. City of Milwaukee*, 204 Fed. Appx. 559, 563 (7th Cir. 2006)). Nevertheless, "an employer's use of subjective criteria may leave it more vulnerable to a finding of discrimination, when a plaintiff can point to some objective evidence indicating that the subjective evaluation is a mask for discrimination." *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 396 (7th Cir. 2010) (citing *Sattar v. Motorola, Inc.*, 138 F.3d 1164, 1170 (7th Cir. 1998)).

Jackson's claim of racial bias suffers from a fundamental flaw. It is undisputed that the City asked each applicant the same five questions about scenarios that might confront a GFGT in the field and provided "behaviorally anchored" rating scales for the interviewers to use. For example, question 3 asked how the candidate would respond if asked to expand the scope of a

pending building renovation project and question 5 asked what the candidate would do if an employee reporting to one of the candidate's foremen is injured. Jackson testified at his deposition that he did not recognize the five standard interview questions, could not recall the answers he gave during his interview, and could not state how he would answer the questions. Thus, the record does not contain critical specifics about Jackson's interview performance viewed from Jackson's perspective. Given the limited interview notes in the record, this means that the court cannot take on the substantively difficult task (given its lack of expertise in construction management) of assessing if Jackson's answers are sufficient to create a question of fact regarding racial bias in the scoring process. *See Millbrook v. IBP, Inc.*, 280 F.3d at 1181 (internal quotations omitted) ("Yet neither the judge nor the jury is as well suited by training and experience to evaluate qualifications for high level promotion in other disciplines as are those persons who have trained and worked for years in that field of endeavor for which the applications under consideration are being evaluated.").

All that is left is Jackson's belief that he performed as well or better than the other candidates. Setting aside a lack of discernable foundation as to how other candidates answered the five questions, Jackson's favorable opinion about his own answers is insufficient to create a triable issue of fact. *See Balderston*, 328 F.3d at 323 (holding that a plaintiff's "own belief that he was the best candidate is irrelevant to the question of pretext"); *Erwin v. Dutch Hous., Inc.*, No. 1:03-CV-21- TS, 2004 WL 3177915, at *10 (N.D. Ind. Feb. 24, 2004) ("The Plaintiff's own belief that she was the best candidate is irrelevant to the question of pretext.").

The circumstantial evidence that Jackson identifies in support of his claim that the interview scoring process discriminated against African-Americans is similarly unavailing.

First, Jackson's reliance on successful GFGT candidate Anthony Greco's opinion that the interview portion of the testing process is subjective is unpersuasive. At his deposition, Greco testified that he believed that grading interview answers was subjective because candidates' answers would correspond to their "skill" and "general industry knowledge." (Pl. Ex. 7, Greco Dep., at 75.) Greco also stated that "there definitely had to be right answers" to interview questions. (*Id.*) Greco's belief that answers would vary based on the candidates' expertise and that correct answers existed does not show that the questions or grading were "subjective" as that term is commonly used. *See* Oxford English Dictionary (2d ed. 1989) (defining "subjective" as "[o]f, relating to, or proceeding from an individual's thoughts, views, etc.; derived from or expressing a person's individuality or idiosyncrasy; not impartial or literal; personal, individual").

Second, Jackson contends that Batchman and Messier did not give him identical scores for all of the interview questions, Messier's score was unfair because Messier's notes indicated that Jackson made two relevant points, and Kapelinski's higher scores were not consistently supported by the interviewers' notes. Jackson asserts that "[t]he point is that not only is the rating subjective but it does not appear to have been based on any logical application of reason." (Pl.'s Resp., Dkt. 79, at 6.) The mere fact that ratings have a subjective component, however, is not enough to support an inference that the scoring system was discriminatory. *See Montgomery*, 626 F.3d at 396 (to create an inference of discrimination based on an employer's use of subjective criteria, a plaintiff must identify "objective evidence indicating that the subjective evaluation is a mask for discrimination"); *see also Hall v. City of Chicago*, 52 Fed.Appx. 259, 263 (7th Cir. 2002) (holding that the plaintiff had "failed to raise a material issue

of fact as to whether the City's purported reliance on the interview scores was false" because "[h]er claim that the subjective nature of the interview scores implies pretext is legally untenable, given her lack of evidence that the interview criteria and scoring system were a 'mask' for discrimination.").

Third, Jackson argues that his high scores on the written portions of the exam call his low interview scores into question. It is just as possible, however, for a candidate to score well on written multiple choice tests about ethics, *Shakman*, and personnel rules (Part I) and technical and supervisory skills (Part II) but earn lower scores when addressing oral questions about hypothetical situations that a GFGT might encounter (Part III). "[F]avor toward the nonmoving party on summary judgment does not extend to drawing inferences that are supported by only speculation or conjecture." *Brown v. Univ. of Illinois*, No. 10 C 06104, 2015 WL 6756266, at *12 (N.D. Ill. Nov. 5, 2015). The supposed link between Jackson's lower interview score and his race, based on his scores for Parts I and II of the exam, is speculative. *Id.*

Fourth, Jackson contends that his scores averaged 70% so the City's contention that he failed the interview and was, therefore, out of the running, shows racial bias. However, the position announcement states that 70% is a passing score *for Parts I and II* and that "[c]andidates who pass all sections of the testing process will be hired by total average score and then seniority/lottery order." (Def. Am. Facts Ex. B, Ex. 1 thereto, at DEF000796.) According to Jaqueline Toledo (the recruiter with the City's Department of Human Resources assigned to the two Department of Fleet and Facilities Services GFGT openings), a score of 60% is required to pass the interview portion of the test. Thus, 70% is a passing score for the two written parts of the test, 60% is a passing score for the interview portion of the test, and the City averages the

scores of candidates who pass the interview and ranks those candidates by seniority. Jackson received a 36% score for his interview so he never proceeded to the stage where his scores could be averaged. Jackson's supposition that adherence to City's scoring protocol supports a claim of race discrimination is meritless.

Fifth, Jackson points to testimony from Wayman Payne (African-American) and Bruno Chuich (Caucasian). Jackson has not provided foundation for Payne's assertion that "everyone at the City" complains about the interview portion of the GFGT test because "those people" are "stacked against" minorities. *See Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 460 (7th Cir. 2014) ("Evidence supporting or opposing summary judgment must be admissible if offered at trial, except that affidavits, depositions, and other written forms of testimony can substitute for live testimony."). In any event, Payne's belief that Jackson's failure to be promoted was racially motivated because there could be no other reason is speculative and fails to call the City's proffered reason – Jackson's poor interview performance – into question. Similarly, Chuich, a carpenter with the Chicago Department of Transportation, has no discernible basis to opine about the interview process for GFGT positions with the Department of Fleet and Facility Management.

Sixth, Jackson asserts that the City "conveniently failed to produce the requisite documentation . . . . for persons promoted to the GFGT position in 2013, i.e., Kapelinski, Grecko [sic] and Swanigan that refer, reflect or relate to their applications, test results or interviews. The Defendant produce [sic] some but not all required documentation stating that was all there was." (Pl.'s Resp., Dkt. 79, at 8.) Jackson appears to be arguing that the City failed to comply with its discovery obligations so "an adverse inference should be taken" that if the City had produced the

documents at issue, "the ratings would not have been favorable or as favorable as the Plaintiff's rating." (*Id.* at 9.)

Setting aside ambiguity as to the nature of the allegedly missing documents, it is well established that a plaintiff can use the defendant's "alleged production failure to forestall summary judgment" only when the plaintiff files a timely motion to compel. *See Griffin v. Evanston/Skokie Consol. Sch. Dist. 65*, No. 12 C 9828, 2014 WL 2598773, at *5 (N.D. Ill. June 10, 2014) (collecting cases). Jackson does not assert that he filed a motion to compel the documents at issue. His adverse inference argument is, therefore, unavailing.

The court also notes that David Reynolds, the Commissioner of the Department of Fleet and Facility Management, and Deputy Commissioner Kurt Peterson were the decisionmakers. Peterson recommended that Reynolds hire Kapelinski and Greco, and Reynolds accepted Peterson's recommendation. Reynolds did not consult with anyone at the Chicago Department of Transportation regarding the decision. To the extent that Jackson claims that other City carpenters (Chuich and Payne) believe that the selection process is biased against African-Americans, no evidence suggests that these carpenters had any input into how interviews were scored or how the candidates were selected. Thus, the carpenters' beliefs about bias have no connection to the process used to select the GFGT candidates.

Moreover, it is undisputed that Reynolds, the decision-maker, was unaware that Jackson was African-American. Jackson does not identify any evidence that suggests that Reynolds or Peterson, who made the hiring recommendation to Reynolds, were aware of any claims of purported bias against African-American candidates based on the interview portion of the GFGT selection process. Interpreting Jackson's filings broadly, he appears to be attempting to impute

an intent to discriminate to Reynolds based on his view that the interview scoring system was racially biased.

The court construes this as an argument based on the so-called "cat's paw" theory.[10] "[T]he 'cat's paw' metaphor refers to a situation in which an employee is fired or subjected to some other adverse employment action by a supervisor who himself has no discriminatory motive, but who has been manipulated by a subordinate who does have such a motive and intended to bring about the adverse employment action." *Cook*, 673 F.3d at 628. To create a question of fact under the "cat's paw" theory of liability, a plaintiff must point to "affirmative evidence that [somebody] improperly influenced the decision-makers." *Brown v. Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1108 (7th Cir. 2012). Speculation that improper influence may have existed is insufficient to carry this burden. *Id.* But speculation is what Jackson has provided.

Next, Jackson's generalized claims of interview bias are unpersuasive. He argues "that the Interviewers did not retaliate or discriminate against [him]" but "whether their actions were intentional or not, the biased and subjective ratings on the oral interview negatively impacted [his] opportunity to compete." (Pl.'s Resp., Dkt. 79, at 11.) To the extent that this argument is based on a "cat's paw" theory, the purported bias in scoring interviews would go back three

---

[10]  As the Supreme Court explains, "[t]he term 'cat's paw' derives from a fable conceived by Aesop, put into verse by La Fontaine in 1679, and injected into United States employment discrimination law by [Judge] Posner in 1990." *Staub v. Proctor Hosp.*, 562 U.S. 411, 427 n.1 (2011) (citing *Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990)). "In the fable of the cat's paw (a fable offensive to cats and cat lovers, be it noted), a monkey who wants chestnuts that are roasting in a fire persuades an intellectually challenged cat to fetch the chestnuts from the fire for the monkey, and the cat does so but in the process burns its paw." *Cook v. IPC Int'l Corp.*, 673 F.3d 625, 628 (7th Cir. 2012).

levels: Reynolds accepted Peterson's hiring recommendation, who relied on the two interviewers, who – according to Jackson – unintentionally discriminated because they were improperly and subconsciously influenced by a biased interview scoring system. This chain of reasoning is insufficient to allow a jury to infer that intentional discrimination existed. *See Odeluga v. PCC Cmty. Wellness Ctr.*, No. 12-CV-07388, 2015 WL 1586244, at *5 (N.D. Ill. Apr. 1, 2015) (citing *Adams*, 324 F.3d at 939); *see generally Jones v. Nat'l Council of Young Men's Christian Associations of the United States of Am.*, 34 F. Supp. 3d 896, 898-901 (N.D. Ill. 2014) (discussing deficiencies in an expert report submitted by the plaintiff to establish that " bias or stereotypes—and particularly unconscious bias against African Americans, which is widely present in the American population—poses greater risk of manifesting itself in conjunction with subjective criteria").

The court concludes by considering if Jackson's proffered support for his failure to promote claim based on racial discrimination, when viewed as a whole, forms a "convincing mosaic . . . from which an inference of retaliatory intent could be drawn." *Hobgood*, 731 F.3d at 643-44. Jackson's evidence rests on his personal opinion (shared by fellow carpenters Payne and Chuich) that the GFGT interview process is biased against African-American applicants and that he deserved a promotion to GFGT in 2013. Even when the court draws all reasonable inferences in Jackson's favor, a reasonable jury could not find that the present record makes it more likely than not that Reynold's decision to select non-minority candidates for the two GFGT positions flowed from a desire to discriminate against African-Americans. Thus, Jackson's efforts to survive summary judgment based on the direct method of proof are unavailing.

2.      **The Indirect Method**

The indirect method of establishing discrimination allows a plaintiff to point to circumstantial evidence that similarly situated employees outside the plaintiff's protected class were treated better to support an inference that the difference in treatment is due to discrimination. *Smith*, 806 F.3d at 905. For a failure to promote claim under the indirect method, a plaintiff "must first produce evidence of a prima facie case of discrimination under the familiar *McDonnell Douglas* test." *Jaburek v. Foxx*, — F.3d. —, No. 15-2165, 2016 WL 143459, at *4 (7th Cir. Jan. 13, 2016) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973)). This consists of evidence showing that the plaintiff (1) belongs to a protected class, (2) was qualified for the position he sought, and (3) was rejected for that position, and that (4) the employer promoted a less qualified person who was outside the protected class. *Id.* (citing *Garofalo v. Vill. of Hazel Crest*, 754 F.3d 428, 439 (7th Cir.2014). If the plaintiff carries this burden, the defendant must identify "evidence supporting a finding that the employment decision was non-discriminatory." *Spangler v. Bd. of Trustees of the Univ. of Illinois*, No. 13 C 4859, 2015 WL 6784339, at *5 (N.D. Ill. Nov. 6, 2015). "If the defendant presents a legitimate, non-discriminatory basis for not promoting the plaintiff, the burden shifts back to the plaintiff to show that the defendant's proffered explanation is pretextual." *Id.*

The City argues that Jackson cannot state a prima facie case because his low interview scores demonstrate that he was not qualified for the position of GFGT (element two of the prima facie case) and he has failed to show that he was better qualified than the non-minority candidates who were selected (element four of the prima facie case). The court agrees, for the same reasons that Jackson's claim of discrimination based on circumstantial evidence fails.

Jackson repeatedly contends that the interviewers evaluated the non-minority candidates more generously because they were not African-American. However, he has not pointed to evidence (as opposed to speculation) sufficient to create a triable issue of fact as to this issue. Moreover, Jackson's contention that the interview process was fatally biased against African-American candidates is inconsistent with the fact that Swanigan (another African-American candidate) earned a passing score of 76% on the interview. While Swanigan did not receive an immediate promotion due to his relative lack of seniority compared to the successful candidates, he was promoted to a GFGT position when Kapelinski retired later in 2013. This fact, along with the arguments discussed above, means that Jackson cannot state a prima facie case under the indirect method. The City's motion for summary judgment as to Jackson's discrimination claim (Count I) is granted.

**B.     Retaliation**

An employer may not discriminate against an employee for opposing an unlawful employment practice, or for making a charge, testifying, assisting, or participating in a Title VII investigation, proceeding, or hearing. 42 U.S.C. § 2000e-3(a). Jackson expressly states that he relies on the direct and indirect methods of proof in support of his claim of retaliation. As with his discrimination claim, his brief mixes elements from each method in support of his respective arguments about the direct and indirect methods. (Pl.'s Resp., Dkt. 79, at 9-11.)

**1.     The Direct Method**

The direct method of proof requires Jackson to submit evidence from which a jury could reasonably conclude that he engaged in statutorily protected activity, the City took a materially adverse action against him (here, the decision to select non-minority candidates for the two

GTGT positions), and the protected activity and the materially adverse action are linked. *See Malin v. Hospira, Inc.*, 762 F.3d 552, 558-59 (7th Cir. 2014).

In support of his retaliation claim, Jackson asserts that retaliation was "on-going" when he applied for a promotion to GFGT in 2013 because he achieved his current position as Foreman of Carpenters by filing a lawsuit in 2003. (Pl.'s Resp., Dkt. 79, at 11.)  A ten-year gap between protected activity and alleged retaliation is too long to establish suspicious timing that supports an inference of retaliation. *See Nan Wei v. Deere & Co.*, 596 F. App'x 499, 501 (7th Cir. 2015) ("And the more than two years that had passed between Wei's administrative complaint and lawsuit and Harmon's choice to substitute a different manager on several projects is too long to raise an inference of causation."); *Naficy v. Illinois Dep't of Human Servs.*, 697 F.3d 504, 513 (7th Cir. 2012) (a five-year gap between the plaintiff's protected activity and layoffs "makes it extremely unlikely that the two events were related" and the nine-month gap between a second complaint and the layoffs "does little to raise suspicion about [the plaintiff's] treatment"); *Anderson v. Bd. of Educ. of Cahokia Sch. Dist. No. 187*, No. CIV. 11-101-GPM, 2012 WL 482301, at *6 (S.D. Ill. Feb. 14, 2012) (three-year gap was insufficient).  No evidence (other than Jackson's speculation) supports an inference that Jackson's protected activity (the 2003 lawsuit) and his failure to secure a promotion in 2013 are causally linked.

Jackson also contends that the City retaliated against him by refusing to give him "acting up" opportunities (the chance to work temporarily as a GFGT to gain experience) and denying overtime and "rotating preferred job assignments."  (Pl.'s Resp., Dkt. 79, at 11.)  These conclusory statements are not developed in Jackson's Rule 56.1 submission.  In any event, they are unpersuasive.  Is Jackson attempting to argue that unspecified City supervisors denied him

chances to perform developmentally beneficial work on unspecified occasions to set him up for failure in the GFGT interview phase due to Jackson's filing of a lawsuit in 2003? To the extent that this is an accurate understanding of Jackson's position, it rests on unspecified factual statements that lack foundation and do not appear in Jackson's Rule 56.1 submission.

Jackson also asserts that the City "argues that the Interviewers did not retaliate or discriminate against [him]" but "whether their actions were intentional or not, the biased and subjective ratings on the oral interview negatively impacted [his] opportunity to compete." (Pl.'s Resp., Dkt. 79, at 11.) Jackson's concession that the interviewers did not retaliate (which seems to sound the death knell to his retaliation claim), combined with his claim that the City is nevertheless liable because the underlying subjective rating system discriminated against African-Americans, does not support an inference that the City's decision to promote Kapelinski and Greco in 2013 is linked to Jackson's 2003 protected activity.

### 2. The Indirect Method

Turning to the indirect method, in the context of a failure-to-promote claim, a plaintiff "must show that: (1) he engaged in statutorily protected activity; (2) he applied for and was qualified for the position sought; (3) he was rejected for that position; and (4) the employer granted the promotion to someone else who did not engage in statutorily protected activity and who was not better qualified for the position than the plaintiff." *Yost v. Chicago Park Dist.*, No. 13 C 8162, 2015 WL 5444850, at *5 (N.D. Ill. Sept. 14, 2015) (citing *Burks v. Union Pacific R. Co.*, 793 F.3d 694, 700 (7th Cir. 2015)).

Jackson contends that he performed as well or better in the interview than Kapelinski or Greco so his low interview scores demonstrate a desire to retaliate. In support, he stresses that

"[i]t is not a secret among the powers that be at City government[] who is filing lawsuits."  (Pl.'s Resp., Dkt. 79, at 11.)  Setting aside the lengthy gap between the protected activity and the interviews, a plaintiff's sweeping assertion that he is better qualified than an individual who receives a promotion is speculative.  *See*, *e.g.*, *Brown v. Health Care Serv. Corp.*, 606 F. App'x 831, 834 (7th Cir. 2015) (rejecting retaliation claim when the court could not compare the plaintiff with the comparators because the plaintiff provided no evidence of the comparators' performance history).

In sum, Jackson's contention that "[t]he record is complete [sic] with sufficient circumstantial evidence such that a jury could infer retaliation" is simply incorrect.  (Pl.'s Resp., Dkt. 79, at 11.)  "[U]ncorroborated speculation does not prevent summary judgment."  *Carothers v. County of Cook*, 806 F.3d 1140, 1153 (7th Cir. 2015) (citing *Ripberger v. Corizon, Inc.*, 773 F.3d 871, 882 (7th Cir. 2014) (finding that plaintiff could not establish causation for retaliation claim when she "provided nothing beyond her own speculation that [her superintendent] had some 'say so' in the decision-making")).  The City's motion for summary judgment as to Jackson's retaliation claim (Count III) is granted.

## IV.  CONCLUSION

For the above reasons, the City of Chicago's motion for summary judgment [64] is granted as to Counts I and III (discrimination and retaliation, respectively).  There are no other pending claims, as Jackson's response to the City's motion for summary judgment, he withdrew his age discrimination claim (Count II).  Thus, the clerk is directed to enter judgment and to terminate this case.

Date:  March 17, 2016                    _____/s/_____
                                         Joan B. Gottschall
/cc                                      United States District Judge